## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NIKA DORSEY,<br>4701 Alabama Avenue SE, Apt. 31<br>Washington, D.C. 20019,<br><br>JONTE WATTS<br>4701 Alabama Avenue SE, Apt. 31<br>Washington, D.C. 20019,<br><br>J.C. (a minor child)<br>4701 Alabama Avenue SE, Apt. 31<br>Washington, D.C. 20019,<br><br>    Plaintiffs,<br><br>    v.<br><br>THE DISTRICT OF COLUMBIA<br>1350 Pennsylvania Avenue NW<br>Washington, D.C. 20004,<br><br>Officer William Dempster<br>Metropolitan Police Department<br>(Badge No. 5390),<br><br>John Doe Officers 1–15,<br><br>    Defendants. | Case No. 1:15-cv-1462<br><br>Jury Trial Demanded |

## COMPLAINT

### Nature of the Action

1.      On the evening of Friday, June 7, 2013, 35-year-old Nika Dorsey was at home with her husband, her mother, and her two youngest children, then 3 and 16, cooking dinner and playing cards.  Without warning, approximately 15 heavily armed officers from the Metropolitan Police Department ("MPD") battered down and burst through her front door without knocking. The police handcuffed both Ms. Dorsey and her husband in front of their three-year-old

daughter.  They also handcuffed Ms. Dorsey's mother, then 56 and suffering from spinal stenosis.  For the entire time of the approximately two-hour search, Ms. Dorsey and her husband remained handcuffed, unable to care for their frightened three-year-old daughter.  Despite Ms. Dorsey's pleas, the officers would not allow her to see her 16-year-old son during the entire search process.  The officers did not inform Ms. Dorsey of the reason for the search for at least the first hour.

2.      16-year-old Jonte Watts, Ms. Dorsey's middle-child, was watching television in his parents' bedroom when an officer burst through the door, unannounced and with gun drawn and pointed at his body.  The officer ordered Jonte to the ground, handcuffed him, and searched him, all without explaining to him what was happening or if the rest of his family was safe. The heavily armed officers terrified and humiliated Jonte, a shy honor-roll student now headed to the University of Wisconsin on a scholarship with plans to study Zoology.  Instead, the armed men forced him to remain on the floor with his hands bound for much of the search.

3.      3-yeard-old J.C., Ms. Dorsey's youngest child, was with her parents and grandmother on the balcony when the police burst through the front door. As her mother, father, and grandmother were all handcuffed, no adult was able to care for the extremely frightened J.C. Even after the premises had been secured and the adults posed no threat, the officers did not allow any of the adults to be free of restraints in order to care for J.C.  She still remembers that day when a group of heavily armed officers burst into her home, handcuffed her family, and rummaged through their personal belongings.

4.      This violent home invasion by MPD officers was based on an improperly and fraudulently obtained search warrant purportedly seeking evidence related to purses stolen from a store in Virginia four days earlier by two suspects who do not live at the home.

5.      The Defendant MPD officers had no evidence that the home had been involved in any illegal activity or that it contained any evidence related to the stolen purses.  MPD officers had no evidence that Ms. Dorsey or anyone living in the home was engaged in any criminal or dangerous activity inside their home.

6.      The basis of the warrant was the alleged involvement of Francis Taylor, a cousin of Ms. Dorsey.

7.      The publicly available search warrant application lacks even a single particularized fact suggesting that any evidence of theft would be found at Ms. Dorsey's home. Instead, the search warrant application is based on only three things: (1) four days earlier, nine purses were stolen by two individuals who fled the scene in a vehicle titled and insured by Francis Taylor; (2) the MPD's officers' check of unspecified sources to find Francis Taylor's address; and (3) Defendant Dempster's generic and conclusory claims that, based on his "training," "experience," and "knowledge," officers were likely to discover "photographs," "recordings," "ledgers," "documents," and "other accessories" in any suspect's home after a theft of multiple purses.

8.      In cases, such as this one, where MPD officers seek a search warrant without particularized facts and based only on their claimed "knowledge," "training," and "experience," searches rarely produce evidence of the illegal activity that police allegedly seek.  For example, MPD officers regularly make similar assertions based on "training" and "expertise" that they will discover documents or records of drug distribution or gun possession following street stops.  Yet, in the one-year period surrounding and including the raid of the Plaintiffs' home, MPD officers failed to locate such documents or other records in over 99% of street-stop "training" and "experience"-based raids.

9.      Although Defendants claimed under oath to the issuing judge that Mr. Taylor lived at the address given in the search warrant application (i.e., the Dorsey residence), earlier that same day MPD officers conducted a warrantless search of Mr. Taylor's actual home, his father's residence, where Mr. Taylor had been living with the mother of his child.   The Defendants confirmed to the Dorseys during the search of their home that they knew the address of and had already been to Mr. Taylor's actual home.   That the officers knew about Mr. Taylor's actual address was withheld from the Superior Court judge authorizing the warrant.

10.      No evidence of Mr. Taylor's involvement in any criminal activity was discovered during the unlawful raid of the Dorsey home.

11.      During the course of the unlawful raid, officers humiliated, traumatized, and frightened vulnerable people completely innocent of any wrongdoing.   Moreover, without any evidence or legal basis, the Defendants seized and searched all of the electronic computing devices that the family owned, including the family's laptop computer and the cellular phones of every member of the family, including Jonte and his mother.   After the Defendants seized all of the family's phones and computer, the family was left unable to communicate with each other or anyone else while the police rummaged through their most intimate documents, records, and family photographs.

12.      The unlawful actions of the local government agents in this case have become a frightening reality for hundreds of impoverished families of color in the District.   Of the more than 50 such families sampled at random by Equal Justice Under Law who have been subjected to these "training" and "experience" based home raids, every single one has been a family of color.   According to the MPD, a family can have their home invaded and have the most private aspects of their lives searched and destroyed, all while they are bound in metal restraints and in

front of their young and frightened children, and all without a single particularized fact connecting their persons or home to any criminal activity.  What happened to Ms. Dorsey's family raises serious questions about the systemic misconduct and recklessness of the MPD and its agents in obtaining search warrants and executing home raids in the District of Columbia.[1]

### Jurisdiction and Venue

13.     This is a civil rights action arising under 42 U.S.C. § 1983 and the Fourth and Fifth Amendments to the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

14.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

### Parties

15.     Plaintiff Nika Dorsey is a 37-year-old resident of the District of Columbia.  Nika Dorsey is the mother of three children, the oldest of whom lives at home while working and the youngest of whom is currently five years old. Ms. Dorsey's middle child, Plaintiff Jonte Watts, is an 18-year-old resident of the District of Columbia and an honor roll student that will be attending the University of Wisconsin in the fall.  Plaintiff J.C. is a 5-year-old resident of the District of Columbia.  Ms. Dorsey is a manager at a call center for Capitol One Bank, where she has worked for five years.  She has worked diligently in order to provide a stable home environment for her family and make sure that her children are given ample opportunities in life.

16.     The District of Columbia is the municipal entity that operates the Metropolitan Police Department and that trains and supervises the Defendant officers.

17.     Defendant Officer William Dempster prepared and swore under oath the search warrant application and participated in the planning and execution of the home raid.

---

[1] The allegations in this Complaint are based on personal knowledge as to matters in which the Plaintiffs have had personal involvement and information and belief as to all other matters.

18.     John Doe Officers 1–15 are the Metropolitan Police Department Officers who participated in the planning and execution of the home raid.   Defendants Dempster and the District of Columbia are in possession of the full names and badge numbers of Defendant John Doe Officers, and their full identities can be easily discovered.   All of the Defendant Officers are sued in their individual capacities.

**Factual Background**

**The Clear Lack of Probable Cause**

19.     The warrant application made by Defendant Dempster to raid Ms. Dorsey's home plainly lacked probable cause.   *See generally* Exhibit 1 (Sworn Application by Officer Dempster).   No reasonable officer could have believed that it established probable cause to search the family's home.

20.     The basis of the warrant was an investigation into the alleged activities of Francis Taylor, a cousin of Ms. Dorsey.   The warrant application does not include particularized facts from the investigation that would link the house of Francis Taylor's cousin, Ms. Dorsey, to any evidence of suspected criminal activity on the part of Francis Taylor.

21.     The warrant application describes an incident on June 3, 2013, in which nine purses were stolen from a store in Leesburg, Virginia. The warrant alleges that two suspects were seen departing in a vehicle titled to two individuals, one of whom is Francis Taylor, a cousin of Ms. Dorsey.   The warrant application does not provide any particular information from which a reasonable officer could infer that evidence would be found at Mr. Taylor's residence, let alone the residence of his cousin, Ms. Dorsey.   The application merely states that Mr. Taylor met the unspecified "description" of one of the suspects.

22.     The warrant application states that officers purported to believe that Mr. Taylor

6

resided at 4701 Alabama Avenue SE, #31, after checking several unidentified sources.  The application does not provide any information on the reliability of addresses provided by a jointly titled car, nor does it provide any information about the date of the title address or the dates associated with any of the other sources.  In fact, MPD officers know from their training and experience that many individuals involved in criminal activities title their vehicles to addresses different than their own.  They also know from their training and experience that many individuals in the District of Columbia change addresses and move locations frequently and that addresses listed in historical electronic databases are often flawed.  The application does not provide any information about the reliability of the other unidentified sources of Mr. Taylor's address nor does it provide any information about other known addresses for Mr. Taylor.  In fact, although withheld from the issuing judge, the Defendants also searched the *actual* residence of Mr. Taylor and the residence of his child's mother on June 7, 2013, *before* searching the home of Ms. Dorsey.

23.    The warrant application does not mention a single particularized fact that would create a likelihood of finding evidence of any crime in Mr. Taylor's home, let alone the home of Ms. Dorsey, where Mr. Taylor did not live.

24.    Lacking any actual facts connecting the home to any criminal activity, Defendant Dempster asserted in his warrant application that he has "learned" that individuals will store stolen goods at "their residences or in vehicles which they have access and control" alongside "photographs or recordings . . . displaying contraband and or fruits of their criminal activity." Aside from the generic and obvious assertion that criminals may store evidence of crimes in locations that they can "access," Defendant Dempster does not provide for any differences in the patterns of behavior exhibited by individuals that have stolen different types or quantities of

goods.  Defendant Dempster does not, for example, explain why purses are the type of stolen goods likely to leave a trail of electronic and paper records and photographs, let alone why they would be located in the particular home listed on unspecified vehicle records of *one* of multiple suspects.

25.    Defendant Dempster stated that cellular phones are "commonly carried by persons to use to communicate to others."  Based on this language, no reasonable officer could believe that the four cellular telephones collected from Ms. Dorsey's home would belong to Mr. Taylor or contain evidence connected to the theft in Leesburg, Virginia.   On the contrary, Officer Dempster's assertion that cellular phones are carried by the individuals that own them suggests that these phones would *not* contain evidence related to Mr. Taylor's suspected involvement in the theft, particularly when it became clear beyond any reasonable doubt that Mr. Taylor did not reside at Ms. Dorsey's home.  No reasonable officer could have believed that the officer had a basis to seize each of the innocent family members' cellular phones, let alone to search those electronic devices.

26.    Defendant Dempster also stated that, based on his "knowledge, training and experience," he knows that the type of computer-stored information that he sought often requires technical expertise to identify the appropriate files containing evidence and instrumentalities of crime and to discover hidden files.  Officer Dempster provided no facts suggesting that the computer and cellular phones seized from Ms. Dorsey's residence would contain hidden files or require extensive searches.  Officer Dempster also provides no facts suggesting that the theft of nine purses is the type of incident that would necessitate extensive searches of a suspected individual's technological storage devices, let alone all of the electronic devices of any family member of any person suspected of stealing purses.

27.     Pursuant to MPD policy and practice and the training and supervision provided by the MPD, Defendant Dempster provides no particularized facts to identify the computers or cellular telephones that would belong to Mr. Taylor or provide evidence of his suspected involvement in the theft.  Defendant Dempster does not even provide any type of search protocol that would be used to establish ownership of these devices or to minimize the intrusiveness of any searches after they were seized but before exploring their contents.

28.     Pursuant to MPD policy and practice and the training and supervision provided by the MPD, Defendant Dempster does not provide information about the scope or methodology of the searches to be conducted through the files contained on the items seized, or any procedures for limiting or minimizing such intrusive general electronic searches as the Fourth Amendment requires.

29.     Seeking to search through any and all electronics found in the home, the warrant application declared that "[p]ersons who engage in the illegal activities commonly photograph or record themselves" with contraband or "fruits of their criminal activity."  Additionally, the application stated that cellular telephones can carry substantial evidence since they "are commonly carried by persons to communicate with others."  Pursuant to MPD policy and practice and the training and supervision provided by the MPD, on the basis of these vague and generic statements, the Defendants sought to seize every cellular phone device in the home.

30.     Personal computers and cellular telephones with computing capacities can contain the most personal, private, and intimate details of a person's or family's life.   The same can also be true of cell phones.

31.     Ms. Dorsey's family, like many D.C. families, relies upon their cellular telephones for communication, as they do not have landlines.

32.     Defendant Dempster had never been in Ms. Dorsey's home and had no evidence connecting the home to criminal activity, other than pursuing a vehicle titled to two individuals and insured to Francis Taylor, a man that Officers knew to live at a separate residence they had searched earlier that day (a fact concealed from the issuing judge).  Defendant Dempster did not even know whether Mr. Taylor owned a computer, a digital camera, or a smart phone, much less that those devices contained evidence of his involvement in any criminal activity, let alone whether they contained evidence about a particular crime relating to purses.  Defendant Dempster did not know that any computers or cellular phones confiscated from Ms. Dorsey's residence were likely to have been used by Mr. Taylor, much less to contain evidence of his involvement in any criminal activity.  Instead, the Defendants knew that Mr. Taylor did not live at the residence and that he had no connection whatsoever to any of the electronic devices.

33.     The warrant application states that the clothing worn by the suspect during the theft may be found at the home, without describing the clothing or providing any information to discern the clothing of the suspect from the clothing of any other individual in the house. Defendant Dempster nonetheless claimed that this information allowed Defendant Officers to ransack the closets of the family without any particularized guidance.

34.     Defendant Dempster sought to justify the search of Ms. Dorsey's home on the basis of its connection to a criminal suspect supported only by unidentified sources and the use of an undated car title and insurance.   From this weak foundation, the warrant application stated that broadly characterized evidence of the suspect's crime would be found at the house.

35.     According to the Defendants, a person like Ms. Dorsey may have her entire physical and electronic life searched by government agents when her home is allegedly linked to a criminal suspect by a highly attenuated and unsupported chain of connections.  This intrusive

search is authorized not by any particularized evidence that the homeowner has ever been involved in illegality or that the home would contain evidence of the particular criminal activity being investigated, but by unsubstantiated, vague, and illegitimate appeals to "training," "experience," and "knowledge" that persons who have stolen items often store these items and technologically stored evidence of their crimes within their homes.

36.     Similarly, according to the Defendants, Ms. Dorsey, Jonte, and J.C. can have their home and electronic devices searched (all while being forcibly handcuffed) without a single particularized fact about Mr. Taylor, Ms. Dorsey, Jonte, J.C., or Ms. Dorsey's home.  Lacking any particularized description of the computer and cellular phones that would link these devices to Mr. Taylor, lacking any search protocol to limit the search to relevant evidence and avoid an overly intrusive look into the intimate details of the Dorseys' lives, and knowing that Mr. Taylor did not reside at Ms. Dorsey's home, the Defendant officers still seized the family's computer and cellular telephones. Hence, according to Defendants, a Washington family may be exposed to an extraordinarily broad and intrusive search of their digitally stored personal information without any meaningful limits on the government's intrusion and without probable cause for such an intrusion.

37.     No evidence corroborating Mr. Taylor's suspected involvement in the theft of the nine purses was discovered in the home raid.

38.     The warrant application in this case lacked a single particularized fact justifying a search of Nika Dorsey, Jonte Watts, J.C., Ms. Dorsey's husband, or their home.  Other than vague assertions of learned knowledge, "training," and "experience," the warrant application presented no actual evidence that the home of Ms. Dorsey had ever been linked to any criminal activity or presently contained any theft-related items.   The application obviously lacked

11

probable cause for the Defendants' search.

## The Warrant Relied on False and Misleading Statements

39.     Lacking any specific facts to justify the home search, the Defendants relied on generic and conclusory statements about "training," "experience," and "knowledge."  In addition to clearly failing on their face to establish probable cause to believe that a raid of the family's home would produce the items sought, the sworn statements of "training," "experience," and "knowledge" were also false and misleading.

40.     Defendant Dempster's claim that police were likely to find the corroborating evidence because of the habits of such criminals was knowingly and recklessly false.  In fact, based on publicly available records, it was far more likely than not that the Defendants would *not* find each of the items sought even were the statements of Mr. Taylor's address honest and accurate.

41.     During the one-year period surrounding and including the Defendants' violent raid of Ms. Dorsey's home, MPD search warrant inventory returns reveal that MPD searches relying only upon generic statements of "knowledge," "training," and "experience" (as opposed to warrants relying on some evidence connecting the home to criminal activity) have been unsuccessful an overwhelming amount of time.  Warrants based solely on statements of "training" and "experience" to provide a purported connection to a location typically constitute between 15–20% of the MPD's executed home search warrants in any given year, even though they are unsuccessful the vast majority of the time.  Not only did Defendant Dempster omit these facts from his warrant application, but Defendant Dempster also failed to include any particularized facts that would support his bare assertions of knowledge.

42.     By making such claims to the Superior Court judge about the physical, paper, and

electronic evidence they were likely to find without telling the judge that, based on MPD's own actual experience, it was far more likely than not that the Defendants would *not* find such materials, Defendant Dempster misled the issuing judge.

43.     The high failure rate of such "training" and "experience"-based searches is not surprising given what was omitted from the issuing judge.  Defendant Dempster failed to inform the judge about other material facts in his possession.

44.     MPD Officers knew of alternative addresses for Mr. Taylor.  In fact, Officers had already searched the home of Mr. Taylor and the home of his baby's mother earlier in the same day they executed the warrant on Ms. Dorsey's home.  Defendants searching Ms. Dorsey's home informed her that they had already visited Mr. Taylor's residence and spoken with his father and sister.  Defendant Officers continued to intimidate Ms. Dorsey and her children, to search through their home and most personal belongings, and to seize and subsequently search through their most private digitally stored records even after they admitted to the family that the entire basis of the warrant application to the judge — that Mr. Taylor lived with the family — was false.

45.     Officer Dempster is assigned to the Auto Theft Investigation Unit and stated that he has "become familiar with the practices of criminals who not only possess stolen autos but are also involved in other crimes surrounding which autos are used."  Officer Dempster failed to inform the issuing judge of differences between the criminal practices of those stealing purses, or similar highly transferrable consumer goods, and practices observed in auto theft investigations.  Officer Dempster knowingly and recklessly failed to state the differences between auto thefts and the theft of purses, differences that materially undermine the sworn assertions provided by Officer Dempster.  Officer Dempster knowingly and recklessly failed to report to the issuing

judge the material differences in the "habits" of criminals who steal a small number of consumer goods (such as nine purses) and criminals who operate large-scale, sophisticated trafficking enterprises in stolen automobiles. He thus withheld information that he knew: those who steal purses from a store using a car registered to themselves are not likely to possess sophisticated electronic recordkeeping of that offense, to the extent any could possibly exist.

46.     Through training its officers to use these statements of "training," "experience," and "knowledge" and by supplying the content of that "training," the MPD has begun an initiative to conduct violent home raids based not on any actual police work or evidence linking a home to criminal activity, but based on false and misleading statements about the habits of a generic category of "[i]ndividuals who commit thefts" or the even more vague "[p]ersons who engage in [] illegal activities." The MPD has based hundreds of warrants on such generic statements over the past several years, even though its officers and supervisors know that the statements are false, misleading, reckless, and vague beyond any intelligible meaning.

47.     The MPD trains its officers that, based on bare bones affidavits like Officer Dempster's and assertions of "training," "experience," and "knowledge," any MPD officer may rely upon one theft (or any criminal offense committed anywhere in the City or neighboring state) to justify the search of innumerable homes in the District. The result is a new MPD policy that trains its officers that they can search any home incident to any arrest by alleging that every type of criminal keeps evidence of his or her crimes in their home or the homes of relatives. Based on the statements of the warrant application, the police could search the home of Mr. Taylor, the home of his child's mother, the home of Ms. Dorsey, and even the homes of still other distant relatives, all seeking the same physical evidence without any specific information to justify the searches of these particular locations.

48.     The Defendants raided the Dorsey home even though they know that they are unlikely to find the evidence that they claim to seek, that Mr. Taylor's actual residence had already been searched, and that no particularized information justified or guided the search of Ms. Dorsey's home.

49.     The MPD trains its officers to substitute these and materially similar statements of "training," "experience," and "knowledge" for actual evidence and particularized facts when they want to search a particular location but lack any evidence about the location.

### The Violent Raid of Ms. Dorsey's Home

50.     The Defendants invaded Ms. Dorsey's home on June 7, 2013, failing to knock and announce their presence prior to breaking in.

51.     No exigent circumstances justified the failure to knock and announce.

52.     Knocking and announcing would not have been futile and would not have created a risk of physical violence.  The warrant itself did not give permission for a violent entrance without knocking.

53.     The Defendants were neither actually nor constructively refused admittance to the house before they forced entry.

54.     The Defendants acted with reckless indifference to and deliberate disregard for the rights of Ms. Dorsey, Jonte Watts, and J.C. when they failed to knock and announce, failed to wait a reasonable period of time, and broke down the door to Ms. Dorsey's home.

55.     Failing to knock and announce creates a high degree of risk and has led to many serious incidents of needless injury because innocent citizens reasonably fear that their home is being invaded by criminals who are not police officers.  Failing to knock and announce deprives homeowners of the chance to open their doors in order to save their property from destruction

and damage and to save themselves from needless shock, embarrassment, and danger.

56.    Instead of knocking and announcing their presence, the Defendants immediately battered through the door of the apartment.  Had Defendants bothered to knock and announce their presence, the door could easily have been opened by Ms. Dorsey or her husband who had noticed the police arrive on the street, but had no reason to believe they were coming to her home.

57.    The Defendants caused permanent damage to the family's door by smashing it.

58.    When the Defendants burst into the home, they seized and handcuffed Ms. Dorsey's mother even though she had a serious spinal condition.

59.    At no point was Ms. Dorsey, her mother, her children, her husband, or any other person violent or threatening to officers.  They remained calm and never threatened officers. Nonetheless, without any justification the Defendants kept Ms. Dorsey in metal restraints on the balcony as they searched the home despite her repeated pleas to see her small son.  Ms. Dorsey was kept in restraints for hours even though the house was secure, she was calm, there was no security risk, and the armed officers dramatically outnumbered the family.

60.    The Defendants had no reason to believe that Ms. Dorsey, Jonte Watts, J.C. or other family members had done anything illegal or threatening.

61.    One of the Defendants handcuffed Jonte Watts at gunpoint and made him lie on the floor.  He was then 16 years old.  Because they did not announce their presence, Jonte did not know that it was police officers who burst into his parents' room with guns drawn while he was watching television.  Jonte was forced to lie on the floor with hands bound for much of the search.

62.    No reasonable officer could have believed that any evidence related to stolen

purses would be discovered by searching Jonte Watts nor was there any reason to presume that the child presented a threat to officers.   Instead, officers implemented MPD department policy and practice to handcuff all residents regardless of whether they pose any security risk, in blatant violation of Supreme Court precedent.

63.    The Defendants then ransacked the home, throwing the family's belongings all around the house.   They found nothing related to the crime that they were allegedly investigating.

64.    When Ms. Dorsey informed the Defendants that Francis Taylor lived around the corner with his father, clearly undermining the purpose of the search, the Defendants informed Ms. Dorsey that they already knew his residence, had been there, and had spoken with both his father and sister.   In fact, Mr. Taylor's vehicle was located outside the other residence.   Still, the Defendants continued to search Ms. Dorsey's home, despite the fact that no reasonable Officer could believe that they were likely to find evidence of stolen purses in a home where everyone knew Mr. Taylor did not live.

65.    Despite knowing that Mr. Taylor did not reside at Ms. Dorsey's home, the Officers ransacked every room in Ms. Dorsey's home.   They searched through her family's documents throughout the house and examined other personal belongings.

66.    The Defendants seized four cellular telephones and a laptop computer from the home.   Ms. Dorsey and her family relied on the cellular telephones for all of their communication.   Due to the seizure of their telephones, Ms. Dorsey was unable to communicate with her family, including her oldest son.   Ms. Dorsey's oldest son had to walk home through Southeast Washington neighborhoods late that night from work because he could not call anyone at home to come and pick him up.

67.     It took the family several days to clean the home.

68.     The family's phones were not returned for weeks.

69.     When the laptop computer was returned weeks later, it was not functioning properly and is now broken and unusable.

70.     The illegal electronics searches, the illegal and prolonged bodily seizures, and the failure to knock and announce are routine occurrences inflicted as matter of pattern and practice by MPD officers due to the failure of the MPD to train its officers on the proper legal standards for such searches, seizures, and physical tactics and the failure of the MPD to discipline officers who routinely and openly engage in those violations as a matter of policy and practice. Interviews with many dozens of families subjected to similar searches reveal that such policies and practices are a matter of standard practice and routine for MPD officers executing search warrants.

71.     The experience traumatized and humiliated Ms. Dorsey, her mother, and her two children. The family has no idea what intimate details of their lives were examined and stored by government agents from their phones and computers, and the thought of government agents and officials knowing the private intimate details of their lives is embarrassing. Ms. Dorsey, Jonte Watts, and J.C. no longer feel safe in their own home.

## Claims for Relief

**One:   The Warrant Application Was so Lacking in Probable Cause that No Reasonable Officer Could Have Relied on It in Good Faith.   Reliance on the Warrant Application Violated the Fourth Amendment.**

72.     The Plaintiffs incorporate by reference the allegations in paragraphs 1–71 above.

73.     The Defendants obtaining, planning, and executing the search warrant for the Plaintiffs' home relied on a warrant application that was so plainly lacking in probable cause that

no reasonable officer could have relied on it in good faith.  The warrant application utterly failed to provide any particularized facts linking the home to any criminal activity, let alone to establish probable cause that the list of specific items sought would be found.

**Two:  The Warrant Application Contained Statements that Were Knowingly and Recklessly False and Made Material Omissions in Violation of the Fourth Amendment.**

74.     The Plaintiffs incorporate by reference the allegations in paragraphs 1–73 above.

75.     The warrant application presented to the Superior Court judge contained numerous statements of "training," "experience," and "knowledge," as well as statements concerning the basis of Defendant Dempster's knowledge and experience, that were knowingly and recklessly false and misleading.  The warrant application also omitted material facts known to the MPD officer seeking the warrant that, if presented, would have undermined the asserted basis for seeking the warrant.   The Fourth Amendment prohibits obtaining a warrant on the basis of knowingly and recklessly false and misleading material assertions as well as the knowing and reckless omission of material information that would undermine a probable cause finding.

**Three:  The Obvious Lack of Probable Cause and False and Reckless Statements and Omissions Were the Result of a Policy, Pattern, and Custom of Such Conduct by the MPD and the Result of the MPD's Failure to Properly Train and Supervise Its Officers.**

76.     The Plaintiffs incorporate by reference the allegations in paragraphs 1–75 above.

77.     The MPD has established a pattern, policy, and practice of training its officers to include in search warrant applications statements of "training" and "experience" that are unsubstantiated, vague, self-defeating, contradictory, woefully insufficient to substitute for actual evidence, and materially false and recklessly misleading in the ways described in this Complaint. The MPD has established a pattern, policy, and practice of training its officers to use such statements of "training" and "experience" about the habits of "criminals" as a purported substitute for any actual evidence or police investigation into any evidentiary link to a particular

residence.  Despite having knowledge of the fatal factual and legal flaws in these statements, the MPD continues to instruct its officers to predicate search warrant raids on such "training" and "experience"-based statements.   It has also trained its officers not to include in warrant applications to Superior Court judges the dismal failure rates of MPD officers in uncovering such evidence in their search warrant executions.   The MPD has also failed to reprimand and discipline officers who repeatedly prepare and execute legally invalid search warrants.    The MPD has failed to properly train and to properly supervise its officers on the Fourth Amendment standards for obtaining highly intrusive home search warrants.

**Four:  Officers Raiding the Home Failed to Knock and Announce Their Presence Before Breaking the Door and Raiding the Home**

78.    The Plaintiffs incorporate by reference the allegations in paragraphs 1–77 above.

79.    The MPD officers executing the warrant failed to knock and announce their presence prior to smashing the Plaintiffs' door and bursting into the house, even though there were no exigent circumstances to justify the failure to knock and announce.

**Five:   Officers Raiding the Home Exceeded the Scope of the Warrant, Used Excessive Force, Made Unnecessary and Unreasonable Seizures Not Authorized By the Warrant, and Engaged in Conduct that Shocks the Conscience in Violation of the Fourth and Fifth Amendments.**

80.    The Plaintiffs incorporate by reference the allegations in paragraphs 1–79 above.

81.    The MPD officers raiding the home unlawfully searched the home and its occupants — including a frightening and unjustified search of Jonte Watts and the search and handcuffing of Ms. Dorsey, her husband, and her mother in front of Ms. Dorsey's three-year-old daughter — for broadly and vaguely characterized evidence, even though the Defendants knew that the suspect did not reside a the house.   They continued forcibly to seize and search the family even though the family posed absolutely no danger, even though Ms. Dorsey begged to

see her young child, and even though they knew that they were in the wrong house. The MPD Officers invaded the privacy of Ms. Dorsey and her family and seized a laptop and cellular devices containing the most intimate details of their lives even though they lacked entirely any justification for those electronic searches or any of the minimization procedures required to search those devices. These unreasonable, excessive, and grossly disproportionate seizures and searches reflect a pattern and practice of MPD officers in hundreds of similar search warrant raids and reflect the failure of the MPD properly to train, supervise, and disciple its officers concerning how lawfully to execute search warrants. The unlawful, painful, and unjustified search and seizures made to innocent and vulnerable people in their own home shock the conscience and violates the Fourth Amendment.

### Request for Relief

WHEREFORE, Plaintiffs request that this Court issue a judgment against the Defendants:

a. Holding the appropriate Defendants liable to the Plaintiffs for compensatory damages in an amount appropriate to the proof adduced at trial;
b. Holding the appropriate Defendants (other than the District of Columbia) liable to the plaintiffs for punitive damages in an amount appropriate to the proof adduced at trial;
c. Awarding to plaintiffs their costs and reasonable attorneys' fees; and
d. Granting such other and further relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Alec Karakatsanis*
Alec Karakatsanis (D.C. Bar No. 999294)
Phil Telfeyan (D.C. Bar Application Pending)
Equal Justice Under Law
916 G Street, NW Suite 701
Washington, D.C. 20001
(202) 681-2409
*Attorneys for Plaintiffs*

Date: September 8, 2015